IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GREGORY W. BOWDEN,
      Petitioner,

vs.                                    Case No.:  3:13cv305/MCR/EMT

MICHAEL D. CREWS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 20).  Respondent filed an answer and relevant portions of the state court record (*see* doc. 24, Exhibits; doc. 35).  Petitioner filed a reply (doc. 40).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is established by the state court record (*see* doc. 24, Exhibits).[1]  Petitioner was charged in the Circuit Court in and for Walton County, Florida, Case No. 2004-CF-207, with one count of possession of a controlled substance (Count 1), one count of unlawful possession of a listed chemical (Count 2), and one count of possession of drug paraphernalia (Count 3) (Ex. A).  The State subsequently amended the Information to change the

---

[1] Hereinafter all citations to the state court record refer to the exhibits electronically filed by Respondent (*see* exhibits to docs. 24, 35) unless otherwise indicated.  Additionally, if a cited page has more than one page number, the court cites to the "Bates stamp" page number.

charge in Count 1 to trafficking in over 200 grams of methamphetamine (Ex. F at 116–17). Following a jury trial, Petitioner was found guilty as charged (Ex. F at 336–37, Ex. G). On May 3, 2005, the trial court adjudicated Petitioner guilty and sentenced him to a term of twenty-five (25) of imprisonment, with a 15-year mandatory minimum, on Count 1, a concurrent term of ten (10) years of imprisonment on Count 2, and a concurrent term of eleven (11) months and twenty-nine (29) days on Count 3, with pre-sentence jail credit of 485 days (Ex. F at 361–63, Ex. H).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D05-2468 (Ex. I). On November 13, 2006, the First DCA affirmed the judgment per curiam without written opinion (Ex. K). Bowden v. State, 945 So. 2d 508 (Fla. 1st DCA 2006). The First DCA denied Petitioner's motion for rehearing on January 3, 2007 (Ex. M).

On February 22, 2007, Petitioner filed a motion for reduction or modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. N). The state circuit court summarily denied the motion in an order rendered March 20, 2007 (Ex. O).

On December 19, 2007, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (*see* doc. 1 at 10; *see also* Ex. P, Progress Docket, entry dated 12/21/2007). The state circuit court summarily denied the motion on January 2, 2008 (*see* Ex. P, Progress Docket, entry dated 01/02/2008). Petitioner appealed the decision to the First DCA, Case No. 1D08-572 (*see id.,* entry dated 01/30/2008). The First DCA affirmed the decision per curiam without written opinion on August 8, 2008, with the mandate issuing September 4, 2008. Bowden v. State, 988 So. 2d 624 (Fla. 1st DCA 2008) (Table).

On November 16, 2008, Petitioner filed another Rule 3.800(a) motion (Ex. P at 1–2). As one of his claims, he argued the court's imposition of a $250,000.00 fine at sentencing was illegal because the court failed to cite statutory authority for imposition of the fine (*id.*). On December 1, 2008, the state circuit court summarily denied the motion; however, the court directed the clerk of court to amend the written judgment "to correct the scrivener's error" of omission of the assessment of the $250,000.00 fine orally pronounced at sentencing (*id.* at 3–8). The amended judgment was rendered December 5, 2008 (*id.* at 61–62). Petitioner appealed the decision to the First DCA, Case No. 1D08-6370 (*see id.* at 63). The First DCA affirmed the decision per curiam without written

opinion on May 29, 2009, with the mandate issuing June 24, 2009 (Ex. Q).  Bowden v. State, 10 So. 3d 634 (Fla. 1st DCA 2009) (Table).

On January 11, 2009, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D09-219, alleging ineffective assistance of appellate counsel (Ex. R).  The First DCA denied the petition on August 20, 2009 (Ex. U).  Bowden v. State, 16 So. 3d 953 (Fla. 1st DCA 2009) (Mem).

Also on January 11, 2009, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. V at 1–31).  The state circuit court summarily denied the motion on August 23, 2010 (id. at 88–100).  Petitioner appealed the decision to the First DCA, Case No. 1D10-5161 (id. at 109).  The First DCA affirmed the decision as to all but one claim and reversed and remanded as to that claim (id. at 111–12).  Bowden v. State, 54 So. 3d 588 (Fla. 1st DCA 2011) (Mem).  The state circuit court held an evidentiary hearing on the remanded claim, at which Petitioner was represented by counsel (id. at  151–77).  Following the hearing, the court denied Petitioner's remaining claim (id. at 177–83).  Petitioner appealed the decision to the First DCA, Case No. 1D11-5997 (Ex. W).  The First DCA affirmed the decision per curiam without written opinion on October 25, 2012, with the mandate issuing December 27, 2012 (Ex. X).  Bowden v. State, 103 So. 3d 145 (Fla. 1st DCA 2012) (Table).

On December 13, 2012, Petitioner filed a third Rule 3.800(a) motion (Ex. Y).  The state circuit court summarily denied the motion on March 19, 2013 (Ex. Z).

On July 9, 2013, he filed another Rule 3.850 motion in the state court (Ex. AA).  The state circuit court summarily denied the motion on October 17, 2013 (Ex. BB).

Petitioner filed the instant habeas action on May 2, 2013 (doc. 1 at 1, 9).  He subsequently filed an amended petition (doc. 20).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* <u>Henderson v. Campbell</u>, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS[3]

    A.    <u>Ground Two</u>:  "I am being held in violation of the United States Constitution, Amendment VI, Section 1, 'the accused shall enjoy the right to a speedy and public trial . . .' and 'to have the assistance of counsel for his defense.'"

Petitioner alleges the State prosecuted his co-defendant Kenneth Redmon on a theory of guilt which not only contradicted the theory of prosecution it pursued against him but also exonerated him of the crimes (doc. 20 at 5–6).[4]  He specifically contends the State convicted Redmon on the theory that the methamphetamine ("meth"), illegal precursor chemicals, and drug paraphernalia discovered by law enforcement in Redmon's trailer belonged solely to Redmon.  Petitioner claims that defense counsel, Attorney Weinstock, rendered ineffective assistance by (1) failing to press the trial court for rulings on motions concerning the State's presentation of a contradictory theory of prosecution, (2) failing to adequately object, apparently on due process grounds (Petitioner characterizes the State's continuing prosecution as prosecutorial misconduct and bad faith prosecution), to the State's continuing its prosecution of Petitioner on the contradictory theory, and (3) failing to obtain a transcript of the trial court's discussion of the arguments presented by the parties regarding the State's continuing to prosecute Petitioner under a theory that contradicted the theory presented at Redmon's trial (*id.*).  Petitioner contends but for counsel's errors, the State would have been required to terminate its prosecution, or an adequate record would have been created for appellate review of the issue (*id.*).  Petitioner asserts he presented this claim as Issue Six in his Rule 3.850 motion.

Respondent concedes Petitioner exhausted this claim in the state courts (doc. 35 at 27–31).  Respondent contends the State did not present inconsistent theories of guilt at Redmon's and Petitioner's trials; therefore, Petitioner failed to show that counsel performed deficiently, or that he was prejudiced by counsel's alleged errors.

    1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must

---

[3] Petitioner withdrew Grounds One and Five (*see* doc. 40 at 3, 13; doc. 41).

[4] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some

conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

### 2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue Six in his Rule 3.850 motion (Ex. V at 21–24).  In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (*id.* at 90–91).  The court adjudicated the claim as follows:

> **As to Ground 6** (*IAC by trial counsel failing to properly and fully present the trial court with an adequate record or evidence to support the assertion that the prosecution violated his due process rights by proceeding under a contradictory*

*theory with defendant's trial than was used for the co-defendant's trial*), defendant alleges or lists motions that counsel and the State submitted to the trial court in an effort to use the prosecution's prior case theory and to prohibit its use, respectively (*See* page 22 of the defendant's rule 3.850 motion).  The defendant's trial counsel made attempts to use the information, however, the trial court orally denied the defense motions as the index to the record on appeal indicates no written orders on this issue by the Court [sic].  If the defendant wanted to challenge the Court's decision to deny the motions in limine or failure to rule on them, then this issue should have been raised on direct appeal and is not appropriate for a post-conviction relief motion.  Accordingly, defendant's Ground 6 is hereby summarily denied as procedurally barred.

(Ex. V at 97).  The First DCA affirmed the decision without explanation (Ex. V at 111–12).

Petitioner contends the First DCA's decision does not qualify as an adjudication on the merits, and thus is not entitled to deference, because the court's affirmance without explanation renders it impossible to determine if the decision was contrary to or an unreasonable application of federal law (*see* doc. 40 at 3–4).

Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."  *See* <u>Harrington</u>, 131 S. Ct. at 784.  When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.* at 784–85.  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 785.

In this case, Petitioner arguably has shown that the state court did not adjudicate the merits of his ineffective assistance of counsel ("IAC") claim.  The state circuit court apparently construed Petitioner's claim as including a claim of trial court error with respect to its rulings, and/or failure to rule, on certain pre-trial motions.  The court deemed that aspect of Petitioner's claim as procedurally barred because it should have been raised on direct appeal.  However, the state circuit court also recognized the IAC aspect of the claim and noted that defense counsel attempted to use the prosecution's theory in the Redmon case to the defense's advantage in Petitioner's case.  The court did not indicate that the IAC aspect of the claim was improperly raised in a Rule 3.850 motion; indeed state law procedural principles provide that IAC claims are typically "not cognizable on

direct appeal." Smith v. State, 998 So.2d 516, 522 (Fla. 2008) (citing a series of prior Florida Supreme Court cases that have held that ineffective assistance of trial counsel claims are, with rare exception, not cognizable on direct appeal).  Although the state circuit court should have more carefully worded its concluding sentence as to Issue Six, its failure to do so does not provide reason to think the circuit court, or the First DCA, applied a procedural bar to the IAC aspect of Petitioner's claim.

However, even if the state court's decision is not entitled to deference, because it applied a state procedural rule in an arbitrary and unprecedented fashion, Petitioner is still not entitled to federal habeas relief.  Petitioner faults counsel for (1) failing to press the trial court for rulings on motions concerning the State's presentation of a contradictory theory of prosecution at Redmon's trial, (2) failing to adequately object, on due process grounds, to the State's continuing prosecution of Petitioner on the contradictory theory, and (3) failing to obtain a transcript of the trial court's discussion of the arguments presented by the parties regarding the State's continuing prosecution of  Petitioner under a theory that contradicted the theory it presented at Redmon's trial (doc. 20 at 5–6).

The court will first address Petitioner's contention that defense counsel performed ineffectively by failing to argue that the State was precluded from prosecuting Petitioner on a theory that was inconsistent and irreconcilable with the theory it presented in Redmon's trial for the same offenses arising out of the same event.  Petitioner contends that in Redmon's trial, the prosecutor presented a theory that Redmon was the sole possessor of the methamphetamine and related material (chemicals and paraphernalia), but in Petitioner's trial, the same prosecutor presented a theory that Petitioner and Redmon jointly possessed the drugs and related material (*see* doc. 40 at 6–8).

Initially, Petitioner's reliance upon the Supreme Court's decision in Berger v. United States, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) is misplaced (*see* doc. 40 at 4).  In Berger, the Supreme Court ordered a new trial after it determined that the prosecutor had struck "foul" blows in prosecuting Berger.  295 U.S. at 88.  The Court described the conduct of the prosecutor as "indecorous and improper" because he, among other things, bullied witnesses and misstated facts; but the Berger Court, however, did not mention any issue about the use of allegedly inconsistent theories in prosecuting two defendants.  *Id.* at 84.  Indeed, the Supreme Court has never held that

the Due Process clause prevents a State from prosecuting defendants based on inconsistent theories. *See* Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1235 (11th Cir. 2008) (citing Bradshaw v. Stumpf, 545 U.S. 175, 190, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005) (Thomas, J. concurring)).[5]

Federal courts of appeals have considered the issue of whether inconsistent prosecutorial theories can violate a defendant's due process rights. In Drake v. Francis, the Eleventh Circuit evaluated two prosecution arguments for two defendants convicted of the same murder. The court determined that the State's theories in the two trials were not totally inconsistent. 727 F.2d 990, 994 (11th Cir. 1984). At each trial, the State clearly demonstrated its belief that both Drake and co-defendant Campbell were involved in the murder-robbery. *Id.* At co-defendant Campbell's trial, the prosecutor alleged that Campbell actually perpetrated the murder while Drake played a lesser role. *Id.* Conversely, during Drake's trial, the prosecutor relied on Campbell's physical inability to commit the murder on his own in order to implicate Drake in the actual murder as well. *Id.* Hence, the only inconsistent theory propounded in the two trials was that Campbell's prosecutor believed Campbell was the sole murderer, while in Drake's case, the prosecutor urged that, due to sheer physical necessity, Drake must have participated in the attack as well. *Id.* Viewed in this light, the Eleventh Circuit held that the two theories were fairly consistent, and there was no due process violation. *Id.* On rehearing en banc, the majority declined to reach the issue, granting relief on other grounds. *See* Drake v. Kemp, 762 F.2d 1449, 1451, 1461 (11th Cir. 1985) (en banc). In his special concurrence, Judge Clark addressed the due process issue. After exhaustively recounting the evidence regarding what he concluded were totally inconsistent theories of the same crime, he concluded that "[t]he state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." *Id.* at 1479 (Clark, J., specially concurring).

---

[5] In Bradshaw, the Supreme Court confronted a habeas petitioner's "assertions of inconsistency relate[d] . . . to the prosecutor's arguments about which" two co-defendants shot the victim. 545 U.S. at 187. There, the petitioner insisted that the prosecution's argument to his sentencing panel was inconsistent with its argument at his co-defendant's trial and, therefore, rendered his death sentence unconstitutional. *See id.* at 180–82. In response, the Court found it "at least arguable" that the prosecution's use of inconsistent theories was material to the sentence imposed. *Id.* at 187. But because the import of the alleged inconsistency was not clear, the Court reserved the hybrid question of "whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial." *Id.* Consequently, the Court remanded the case for further consideration. On remand, the Sixth Circuit held, in a divided opinion, that there was no due process violation. *See* Stumpf v. Robinson, 722 F.3d 739, 749 (6th Cir. 2013) (en banc).

In the subsequent decision of <u>Parker v. Singletary</u>, the Eleventh Circuit held that no violation of due process occurs where the State does not use necessarily contradictory evidence but simply argues alternative theories as to uncertain facts, and leaves the resolution of factual issues to each co-defendant's jury.  974 F.3d 1562, 1578 (11th Cir. 1992).

The Fifth Circuit has rejected the argument that the use of inconsistent theories in separate trials of co-defendants is a violation of the Due Process Clause.  *See* <u>Pondexter v. Quarterman</u>, 537 F.3d 511, 527 (5th Cir. 2008) (citation omitted); *see also* <u>Nichols v. Scott</u>, 69 F.3d 1255, 1268–72 (5th Cir. 1995) (discussing the issue of seemingly inconsistent prosecutorial arguments for different defendants at different trials, but in the context of estoppel, both collateral and judicial, and finding that prosecution's argument were not factually inconsistent).

The Eighth Circuit has held that the use of inherently factually contradictory theories violates the principles of due process; however, the inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime.  *See* <u>Smith v. Groose</u>, 205 F.3d 1045, 1052 (8th Cir. 2000).[6]

The Ninth Circuit has held that a prosecutor's pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same crime can violate due process if the prosecutor knowingly uses false evidence or acts in bad faith.  *See* <u>Nguyen v. Lindsey</u>, 232 F.3d 1236, 1240 (9th Cir. 2000).  For example, in <u>Thompson v. Calderon</u>, a plurality of the Ninth

---

[6] During Smith's trial for the murder of Mr. Chambers during a robbery of his home, co-defendant Lytle testified that <u>after</u> Smith and co-defendant Bowman had left Chambers home, he (Lytle) saw Mr. Chambers's body lying in a doorway and asked Cunningham (another robber, but not part of the group of robbers to which Smith belonged), "What did you do to this guy?"  205 F.3d at 1047.  Cunningham responded, "Don't worry about it.  We took care of it."  This version was consistent with a statement Lytle made to police on November 30, 1983.  *Id.*

On December 2, 1983, Lytle told police a different story.  He told police that his group (which included Lytle, Smith, Bowman, and Dixon) were inside the house before Mr. Chambers was murdered, and he saw Bowman stab Mr. Chambers with a knife.  205 F.3d at 1047.  Lytle later recanted this statement.  *Id.*

When trying Smith for murder, the State asserted that Lytle's statement to police on December 2, 1983 was the truth, that Lytle had made up his in-court testimony during Smith's trial to try to avoid his and his associates' convictions for felony murder, and that co-defendant Bowman had killed the victims after Smith's group entered the house.  *Id.* at 1050.  Subsequently, when trying Cunningham, the State contended that Lytle's November 30, 1983, statement was the truth, and objected to a line of questioning by defense counsel based on the theory that Lytle was lying about Cunningham's complicity in order to protect his friends. *Id.*  The Eighth Circuit held that the State's use of inherently factually contradictory theories violated principles of due process, and that Smith was entitled to federal habeas relief, because the State's error rendered his convictions unreliable. *Id.* at 1052.

Circuit held that the State violated Thompson's due process rights by arguing at his trial that he alone committed a murder, while arguing at a subsequent trial that a co-defendant actually committed the same murder.  120 F.3d 1045, 1058–59 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998).  After noting the fundamental duty of prosecutors "to vindicate the truth and to administer justice," the court pointed out that the prosecutor in the co-defendant's trial "returned to his original theory and discredited the very evidence he had previously offered in Thompson's trial." *Id.*  The prosecutor had argued different motives, different theories, and different facts for each defendant, and had secured convictions at both trials.  *Id.* at 1059.

Here, Petitioner argues only that the prosecutor pursued inconsistent or contradictory theories at the two trials—he does not point to any evidence presented by the State in Redmon's trial that necessarily contradicted the evidence presented by the State in his own trial.  Petitioner argues that "testimonial consistencies or the **lack thereof**" were a factor in the jury's weighing the testimony of Kenneth and Kimberly Redmon, thus suggesting that the testimony of the Redmons during Petitioner's trial was inconsistent with their previous testimony (*see* doc. 40 at 5 (emphasis in original)).  However, the transcript of Redmon's trial demonstrates that neither Redmon nor his wife testified during Redmon's trial (*see* Ex. CC).

Further, upon the undersigned's thorough review of the trial transcripts of Petitioner's and Redmon's trials, the court concludes the State did not present factually inconsistent and irreconcilable evidence.  Additionally, there is no indication the prosecutor knowingly used false evidence or otherwise acted in bad faith.

The State presented the following evidence in both trials.  On March 3, 2004, law enforcement officers went to Kenneth and Kimberly Redmon's trailer to serve a warrant on Petitioner, and they discovered Kenneth Redmon lying on the bed in one of the bedrooms (*see* Ex. G at 31–42, Ex. CC at 62–67).  They discovered Petitioner locked in the bathroom at the rear of the trailer (*id.*).  After the officers removed Petitioner from the bathroom, they discovered items consistent with methamphetamine use and production, specifically, a hypodermic needle, a spoon with residue, a Q-Tip, a one-gallon distilled water jug half full of clear liquid, a hot plate with residue, a Pyrex dish with residue, and a 20-ounce plastic bottle half full of clear liquid (Ex. G at

43–53, Ex. CC at 19–33).  The officers found the distilled water jug, the 20-ounce plastic bottle, the spoon, the hypodermic needle, the business card, the oral syringe, and the Q-Tip on the toilet seat (*id.*).  The hot plate and Pyrex dish were located on the counter next to the bathroom sink (*id.*).  Officers also testified they discovered a green plastic 20-ounce bottle containing a bi-layer liquid and a half-gallon glass jar containing bi-layer liquid in a cabinet on the left side of the bathroom sink (Ex. G at 81, 111–15, 118–21, Ex. CC at 31–33).  In both trials, the State presented testimony that samples of the liquid in both of those containers were tested in a laboratory, the samples tested positive for methamphetamine, and the green plastic bottle contained just under 200 grams of methamphetamine, while the glass jar contained 549.6 grams of methamphetamine (Ex. G at 205–15, Ex. CC at 108–09, 161–71).  The State also presented evidence that residue from the spoon, hot plate, and Pyrex dish, discovered on the toilet seat and the bathroom counter, tested positive for methamphetamine (Ex. G at 205–15, Ex. CC at 166–71).

In both trials, the State presented testimony regarding items discovered by law enforcement underneath the trailer's kitchen sink, including two shortened straws which may be used for snorting methamphetamine or any other drug, rolling papers which may be used for rolling marijuana cigarettes, a can of acetone which may be used in manufacturing methamphetamine, a gallon can of denatured alcohol which may be used in manufacturing methamphetamine, a gallon of muriatic acid which may be used in manufacturing methamphetamine, charcoal lighter fluid which may be used in manufacturing methamphetamine, coffee filters which may be used as a strainer in the manufacturing process, lye which may be used in manufacturing methamphetamine, float scales which may be used as drug paraphernalia, a Coke bottle containing red phosphorous which may be used in manufacturing methamphetamine, and a pill bottle containing iodine crystals which may be used in manufacturing methamphetamine (Ex. G at 90–99, Ex. CC at 33–39, 68–85).  At both trials, the State also presented testimony regarding the process of manufacturing methamphetamine, and how each of the chemicals and items discovered in the trailer may be used in the process of manufacturing or using methamphetamine (Ex. G at 52–55, Ex. CC at 90–95).

In Redmon's trial, the State presented testimony from a fingerprint expert, who testified she obtained two latent fingerprints of value from a green plastic bottle and one latent fingerprint of value from a glass jar (the items in the bathroom cabinet containing liquid that tested positive for

methamphetamine) (Ex. CC at 113–32).  She testified she eliminated Petitioner as the source of the fingerprints, and determined that one of the fingerprints on the green bottle was Redmon's, and the fingerprint on the glass jar was Redmon's (*id.*).  Although the State did not call the fingerprint expert as a witness in Petitioner's trial, defense counsel did (*see* Ex. G at 221–24).  The expert testified consistently that Petitioner's fingerprints were not located on any of the items submitted to her for analysis (*id.*).[7]

Redmon's wife, Kimberly, testified in Petitioner's trial.  She testified Kenneth and Petitioner arrived at the trailer together on March 3, 2004 (Ex. G at 136–61).  She testified she saw Petitioner take grocery store bags out of Kenneth's truck and carry them into the trailer.  She also testified she heard Kenneth and Petitioner talking about cooking meth in the house.  She testified she left the trailer for approximately an hour, and when she returned, both Kenneth and Petitioner looked like they had been using meth.  She testified she had previously used meth with both of them, and she could tell by their dilated pupils that they had been using it.  She testified she told both of them to stop and remove everything from the house, but they refused.  She testified she lied down in the bedroom and could hear Petitioner walking from the kitchen to the bathroom.  She testified she heard Petitioner and Kenneth say they had obtained the meth-making items from "Marvin's" house, where Petitioner had previously resided.  She testified that Marvin knocked on the front door, asked for Petitioner, and appeared angry, but she told him Petitioner was not there.  She testified that before Marvin arrived, Petitioner told her to tell Marvin he wasn't there, and Petitioner told her he did not know why Marvin was angry, because Petitioner had bought everything he took from Marvin's house.  Ms. Redmon testified Petitioner asked her to allow him to stay in the trailer until the next day, and then he would "clean everything up" and leave.  She testified that within an hour, sheriff's deputies knocked on the door.  She testified she, Kenneth, and Petitioner were arrested.  She testified she was charged with trafficking in methamphetamine and convicted of two felonies related to the incident.  She testified she pleaded guilty to the charges in exchange for a sentence of three years in prison followed by four years of probation, as well as her agreement to testify

---

[7] The Supreme Court has recognized a due process violation where the trial court refused to allow the defense to present exculpatory testimony from a witness who had given the same exculpatory testimony in a co-defendant's previous trial.  *See* <u>Green v. Georgia</u>, 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979).  Here, the defense was not prevented from presenting the fingerprint expert's testimony.

truthfully in Petitioner's and her husband's trials. She testified she did not testify in her husband's trial. Ms. Redmon also testified that "a long time ago," she assisted Kenneth in making controlled buys for the sheriff's department in order to help him get reduced or lenient sentences. She testified that prior to March 3, 2004, Kenneth had manufactured methamphetamine in the house once or twice, and she had helped him, but this had occurred a few months prior to March 3. She testified there was no methamphetamine or drug paraphernalia in the trailer prior to Petitioner's bringing it on March 3, 2004. She admitted she had previously used methamphetamine for a period of eight to ten months, and she had previously seen Petitioner use methamphetamine.

Kenneth Redmon testified that earlier in the day on March 3, 2004, Petitioner told him that he knew where he could get "some stuff" to manufacture methamphetamine (Ex. G at 162–93). Redmon testified he and Petitioner went to the house owned by Marvin and Chris, and Petitioner went inside and then returned to Redmon's truck with two bags in one hand and a jug of acetone and a jug of denatured alcohol in the other hand. Redmon testified he and Petitioner went to a convenience store and purchased a gallon jug of distilled water, three boxes of matches and a container of lye, all of which are used in the production of meth. He testified they then went to a hardware store, where Petitioner purchased a bottle of iodine, which is also used in the production of meth. The men went to another store, and Redmon bought the large glass jar into which they subsequently put the meth oil. They also went to an office supply store and purchased a set of "float" or "letter" scales. Redmon testified he and Petitioner went to the trailer where he and his wife lived. He testified he told his wife that he and Petitioner were going to cook meth, and she protested and left the trailer. While she was gone, he and Petitioner prepared to make meth. Redmon testified they needed more red phosphorus, so Petitioner cut up matches. They then manufactured the meth, and Redmon "did one shot" of it. Redmon testified after Kimberly returned to the trailer, he told Petitioner that he and Petitioner needed to leave. Redmon testified Petitioner refused, so Redmond asked Kimberly to leave the trailer with him. Redmon testified there was a knock on the door, and law enforcement officers announced their presence. Redmon testified that a few months prior to March 2004, he had been with Petitioner when Petitioner used meth, and he saw Petitioner trade items of property for meth. Redmon admitted he had previously been a paid informant for law enforcement. He also admitted that a jury found him guilty for the offenses

related to the March 3, 2004 crimes, and the court sentenced him to twenty-five years in prison.  He testified his prior role as an informant did not help him in his criminal case.

Redmon did not testify at his own trial, but during his trial the State presented evidence that Redmon told one of the officers that Petitioner brought the precursor chemicals and other items to the trailer on March 3, 2004 (Ex. CC at 26, 47, 58–59).

At Petitioner's trial, the State also presented evidence of Petitioner's statements to law enforcement.  One of the officers testified that Petitioner told him he had been in the trailer for approximately forty-five minutes prior to the officers' arrival, but he denied knowledge of the drugs, chemicals, and paraphernalia discovered in the trailer (Ex. G at 65, 103–04, 106).  The officer testified that Petitioner commented to him about the chemicals and paraphernalia discovered in the kitchen, even though he (the officer) had not told Petitioner that chemicals and paraphernalia had been found in the kitchen (*id.* at 106–07).  Another officer testified that on March 5, 2004, Petitioner summoned him to his jail cell and admitted he had previously "traded some items for methamphetamine" (*id.* at 195).

Contrary to Petitioner's argument, the prosecutor did not argue inconsistent theories of guilt at Redmon's and Petitioner's trials.  During the closing argument in Redmon's trial, the prosecutor argued that Redmon knowingly manufactured or possessed over 400 grams of methamphetamine, based upon the following evidence:  he allowed Petitioner to bring the meth (or the chemicals and other items used in its production) into his home, his fingerprint was on each of the two bottles containing the meth (the green plastic bottle and glass jar found in the bathroom cabinet), and he told law enforcement that there was meth oil in the two containers (Ex. CC at 202–212).  As to the possession of listed chemicals and drug paraphernalia charges, the prosecutor argued that the chemicals and items were in Redmon's home, and he knew they were there.  The prosecutor argued Redmond possessed the chemicals with intent to unlawfully manufacture meth, or knowing that the chemicals would be used to unlawfully manufacture meth, as evidenced by the testimony that two years prior, he had shown law enforcement that the chemicals and items used to manufacture meth were in his girlfriend's car.  The prosecutor referenced the evidence that Petitioner's fingerprints were not found on any of the chemical containers or other items, but she did not argue that the

absence of Petitioner's fingerprints suggested he was not involved—to the contrary the prosecutor argued that both men were involved in committing the crimes.

During the closing argument in Petitioner's trial, the prosecutor conceded that the methamphetamine, chemicals, and paraphernalia were found in Redmon's home, and that only Redmon's fingerprint was found on the two items containing methamphetamine (the green plastic bottle and glass jar found in the bathroom cabinet) (Ex. G at 243–56, 261–65). The prosecutor argued Petitioner brought the chemicals and paraphernalia to the Redmons's home, the Redmons knew that Petitioner brought the chemicals and paraphernalia to their home, and both Petitioner and Kenneth Redmon produced the methamphetamine found in the Redmons's bathroom. The prosecutor argued that Petitioner was in actual and constructive possession of the meth oil contained in the plastic bottle and the glass jar, because those items were in the bathroom, and Petitioner had exclusive control over the bathroom because he locked himself in it. The prosecutor argued Petitioner knew it was meth, because he admitted to law enforcement that he had previously traded items for meth, and the Redmons testified they had been with Petitioner when he used meth. She further argued the evidence showed Petitioner brought the chemicals and other items to the Redmons's home and manufactured meth with Kenneth Redmon. With regard to the fingerprints, she argued that the fact that only one of Redmon's fingerprints was found on two different items did not suggest Petitioner did not know that the meth was in the bathroom, because there were items of paraphernalia sitting on the toilet seat and the counter that a person must have placed there, yet none of those items had any fingerprints of value on them.

Petitioner failed to show that the State presented facts in either trial that were necessarily contradictory or inherently inconsistent with the facts presented in the other trial, or that the State knowingly presented false evidence or otherwise acted in bad faith in the conduct of his trial. Therefore, there was no due process violation in the State's continuing its prosecution of Petitioner after it obtained Redmon's conviction. *See* United States v. Fulks, 683 F.3d 512, 524–25 (4th Cir. 2012) (Government's approach to defendant's trial and co-defendant's trial was not inconsistent at its core, precluding defendant's due process claim in his prosecution for carjacking and kidnapping resulting in death, even if the Government used inconsistent argument concerning the vagueness of the co-defendant's potentially inculpatory statements, where the core theory in each case was that

both the defendant and the co-defendant were equally culpable for the victim's death, and both defendants were similarly deserving of capital sentence regardless of which one actually killed the victim, and there was no material variance in the facts proved to establish the victim's death at the hands of the defendant and co-defendant); <u>Clay v. Bowersox</u>, 367 F.3d 993, 1004 (8th Cir. 2004) (prosecutor's acknowledgment in co-defendant's trial, which occurred after petitioner's trial, that the evidence presented to both juries left open the possibility that either defendant could have pulled the trigger, does not render petitioner's trial unreliable where there was no showing that inconsistent evidence was presented to the two juries); <u>United States v. Paul</u>, 217 F.3d 989, 989–99 (8th Cir. 2000) (defendant's trial was not unfair or in violation of due process on the theory prosecutor relied upon factually inconsistent theories to obtain murder convictions by arguing at both trials that the defendant on trial pulled the trigger; the theory that either defendant, or both, shot victim, was not factually irreconcilable and was supported by the evidence, defendant could have been convicted of aiding and abetting in the murder under either theory, and evidence at the different trials was not factually inconsistent and irreconcilable).   In light of the conclusion that Petitioner failed to show a due process violation with regard to the State's continuing its prosecution, Petitioner failed to satisfy either prong of the <u>Strickland</u> standard with respect to defense counsel's failure to object, on due process grounds, to the State's continuing prosecution.

With regard to Petitioner's remaining arguments, that defense counsel was ineffective for failing to obtain rulings on motions concerning the State's prosecuting him on an allegedly inconsistent theory, and counsel's failing to obtain a transcript of the trial court's "discussion" of this issue to establish a record for appellate review of the issue, Petitioner has not shown, for the reasons discussed *supra*, a reasonable probability of success on appeal if his trial counsel had established a record for appeal.  Therefore, Petitioner has not satisfied either prong of the <u>Strickland</u> standard with respect to either of these sub-claims.

Petitioner has not satisfied the two-pronged <u>Strickland</u> standard as to any of the claims raised in Ground Two.  Therefore, is not entitled to federal habeas relief.

     B.     <u>Ground Three:  "I am being held in violation of the United States Constitution, VI, Section 1, 'The right to assistance of Counsel.'"</u>

Petitioner contends he was denied effective assistance of counsel on direct appeal because appellate counsel failed to raise the issue that he was denied a fair trial by virtue of the State's

prosecuting him on a theory allegedly inconsistent with the theory upon which it prosecuted Redmon. He also contends appellate counsel was ineffective for failing to supplement the record with transcripts of the trial court's rulings on the parties' motions relating to that issue (*id.*). Petitioner asserts he raised this issue in his state habeas petition alleging ineffective assistance of appellate counsel (*id.* at 7).

Respondent concedes Petitioner exhausted this claim (doc. 35 at 31–32). Respondent contends appellate counsel was not ineffective, because counsel had no meritorious basis to argue a due process violation (*id.* at 32–33).

1.      Clearly Established Federal Law

Claims of ineffective assistance of appellate counsel are governed by the <u>Strickland</u> standard. *See* <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264 (11th Cir. 2009) ("Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under <u>Strickland</u>."). As previously discussed, under that standard, a defendant must establish (1) that his counsel's performance was deficient, and (2) that the deficient performance was prejudicial. <u>Strickland</u>, 466 U.S. at 687.

Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *See* <u>Strickland</u>, 466 U.S. at 688; <u>Chandler</u>, 218 F.3d at 1315 (a petitioner must "establish that no competent counsel would have taken the action that his counsel did take."). Thus, to show that his appellate counsel failed to provide the level of representation required by <u>Strickland</u>, a petitioner must show more than the mere fact that appellate counsel failed to raise a potentially meritorious claim; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted that claim. *See* <u>Hittson v. GDCP Warden</u>, — F.3d ___, 2014 WL 3513033, at *44 (11th Cir. July 9, 2014) (applying <u>Chandler</u> to claim of ineffective assistance of post-conviction counsel). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. In assessing an appellate attorney's performance, the court is "mindful that the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue. Rather, an effective attorney will weed out weaker arguments,

even though they may have merit." Philmore, 575 F.3d at 1264 (internal quotation marks omitted). Appellate counsel's performance will be deemed prejudicial only if "the neglected claim would have a reasonable probability of success on appeal." *Id.* at 1265 (internal quotation marks omitted).

2.      Federal Review of State Court Decision

Petitioner raised his claim of ineffective assistance of appellate counsel in his state habeas petition (Ex. R at 3–7).  The First DCA rejected the claim on the merits (Ex. U).  The First DCA's decision is due deference under 28 U.S.C. § 2254(d). *See* Richter, 131 S. Ct. at 784–85; Cullen v. Pinholster, — U.S. —, 131 S. Ct. 1388, 1402, 179 L. Ed. 2d 557 (2011).  Because the First DCA's decision was summary in nature, Petitioner can satisfy the "contrary to" prong only by showing that either the reasoning or the result of the state court decision contradicts Supreme Court precedent. *See* Early, 537 U.S. at 8.  Petitioner can satisfy the "unreasonable application" prong of § 2254(d)(1) only by showing that "there was no reasonable basis" for the state court decision.  Cullen, 131 S. Ct. at 1402 (citation omitted).  The duty of a federal habeas court in these circumstances is clear and was clearly restated by the Supreme Court in Cullen:  "[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Cullen, 131 S. Ct. at 1402 (quoting Richter, 131 S. Ct. at 786).  Because the federal court's evaluation of counsel's performance under Strickland is deferential, as is the court's review of claims adjudicated on the merits by the state courts, the result is "double deference," which is extremely difficult for a petitioner to overcome. Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012).  "[I]t will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Id.*  The instant case is not one of those rare cases.

The record shows that on direct appeal, Petitioner's counsel argued that the trial court abused its discretion by failing to instruct the jury on Petitioner's affirmative defense of lack of knowledge of the illicit nature of, and presence of, the drugs in question (Ex. I).

For the reasons discussed *supra* in Ground Two, it was not unreasonable for the First DCA to conclude that Petitioner failed to show deficient performance or prejudice with respect to

appellate counsel's failure to raise a due process issue with respect to the State's prosecuting Petitioner under a theory allegedly inconsistent with the theory upon which it prosecuted Redmon. Petitioner failed to show that no competent counsel would have winnowed out the due process claim, and he failed to show that appellate counsel's doing so was prejudicial in the <u>Strickland</u> sense. For the same reasons, it was not unreasonable for the First DCA to reject Petitioner's argument that appellate counsel was ineffective for failing to supplement the record on appeal with transcripts of the trial court's rulings on the parties' motions relating to the due process issue. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

      C.    <u>Ground Four: "I am being held in violation of the United States Constitution, Amendment VI, Section 1, 'the accused shall enjoy the right to a speedy and public trial . . .' and 'to have the assistance of counsel for his defense.'"</u>

Petitioner alleges defense counsel performed ineffectively at trial by "opening the door" to admission of evidence that Petitioner was on probation in Georgia for a drug-related offense at the time he was arrested on the meth-related offenses (doc. 20 at 7–8). Petitioner alleges prior to trial, defense counsel filed a motion in limine to exclude evidence of the fact that Petitioner was on probation for a drug-related offense, and the trial court ruled that the nature of the offense was impermissibly prejudicial and thus inadmissible (*id.*). Petitioner alleges during defense counsel's cross-examination of Deputy Hardage, counsel opened the door to testimony that Petitioner was on probation for a drug-related offense (*id.*). Petitioner asserts he raised this claim of ineffective assistance of counsel as Issue Five in his Rule 3.850 motion (*id.* at 8).

Respondent concedes Petitioner exhausted this claim (doc. 35 at 32). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 32–41).

      1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.    Federal Review of State Court Decision

Petitioner raised this claim as Issue Five in his Rule 3.850 motion (Ex. V at 19–20). The state circuit court held an evidentiary hearing on the claim and subsequently adjudicated it as follows:

At trial, law enforcement officers testified that they went to the home of Kimberly and Kenneth Redmon to serve an arrest warrant on Defendant, having received information that he was there.  Defendant was found hiding in a locked bathroom.  Upon a subsequent search of the home, officers found "meth oil," precursor chemicals, and various items of paraphernalia.  Some of the material was in the bathroom where Defendant was located.  Both Mr. and Mrs. Redmon testified as to Defendant's involvement in the manufacture of methamphetamine at their home.

The sole postconviction claim remanded for consideration was summarized by the First District Court of Appeal as follows:  "The appellant argues that trial counsel acted ineffectively because he opened the door to testimony that the appellant was allegedly on probation in Georgia 'for drugs' after the trial court again allegedly, had ruled that the jury was not to hear such testimony."

Defendant states his claim in his postconviction motion as follows:

An acquittal was likely if the jury accepted the fact that Bowden's presence in the mobile home was for some purpose other than manufacturing methamphetamine. The most damaging possible piece of evidence would be something that showed that Bowden had a prior conviction for drugs and yet due to counsel's actions this is what occurred.  A pretrial ruling apparently permitted the State to reveal to the jury that Bowden was on probation from Georgia but the jury was not to learn that it was for drugs.  At trial, however, trial counsel questioned the police officer regarding the conversation he had with Bowden at the house during execution of the warrant.  This opened the door and allowed the State to draw out through the testimony of Officer Hardage that Bowden was on probation in Georgia for drugs.

As a general principle, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that:  1) counsel's performance is deficient; and 2) there is a reasonable probability that the outcome of the proceeding would have been different had counsel not been deficient.  See Torres-Arboleda v. Dugger, 636 So. 2d 1321, 1324 (Fla. 1994) (construing Strickland v. Washington, 466 U.S. 668 (1984)).  Moreover, a court considering a claim of ineffective assistance of counsel need not determine whether counsel's performance was deficient when it is clear the alleged deficiency was not prejudicial.  See Torres-Arboleda, 636 So. 2d at 1324 (emphasis added).  Defendant bears the burden of showing that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  There is a "wide range of professionally competent assistance" that passes this constitutional muster. Bertolotti v. State, 534 So. 2d 386, 387 (Fla. 1988).  Furthermore, there is a "strong presumption that counsel has rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment with the burden on claimant to show otherwise."  Blanco v. Wainwright, 507 So. 2d 1377, 1381 (Fla. 1987) (emphasis added).

Even if Defendant's counsel fell below such reasonable standards, Defendant does not automatically prevail.  Defendant must also meet the prejudice prong of the Strickland test.  For Defendant to prevail on this prong, he must demonstrate that there is a "reasonable probability that, but for the deficiency, the result of the proceeding would have been different."  Spencer v. State, 842 So. 2d 52, 61 (Fla. 2003).  In other words, Defendant must demonstrate a "probability sufficient to undermine confidence in the outcome."  Id.

Following the Court's consideration of the record and the testimony offered at evidentiary hearing, the Court concludes that Defendant was not prejudiced by counsel's alleged deficiency.  While it does appear that counsel may have inadvertently "opened the door" to testimony regarding Defendant's prior drug conviction, counsel also testified at evidentiary hearing that he felt it was "very important to have [Investigator] Hardage indicate to the jury that Mr. Bowden denied any knowledge of the items that were found in the trailer."  Indeed, counsel pointed out almost immediately in his closing argument that Defendant had quickly denied any knowledge of the drugs upon his arrest."  In light of the circumstances, the Court does not find counsel's desire to place Defendant's immediate denial of the charges before the jury to be unreasonable.  Secondly, it appears that the comment was isolated, in that the State did not focus specifically on the information regarding Defendant's prior conviction its closing argument.  Furthermore, as noted previously, both co-defendants testified at trial that Defendant took part in the manufacture of methamphetamine at the residence.  Based on the evidence offered at trial, and considering the testimony offered at evidentiary hearing, the Court concludes that Defendant has failed to demonstrate prejudice, as he has failed to show a reasonable probability that the outcome of his trial would have been different had counsel not "opened the door" to the testimony in question.  Consequently, Defendant is not entitled to relief on this basis.

(Ex. V at 179–82) (footnotes omitted).  The First DCA affirmed the decision without written opinion (Ex. X).

Petitioner contends he was prejudiced because the defense theory was lack of knowledge, and testimony that the nature of his probation was drug-related "torpedoed" that theory (doc. 40 at 11).  The theory of defense presented at trial was that Petitioner knew there was an outstanding warrant for his arrest, he panicked when law enforcement knocked on the door of the trailer, and he ran into the dark, unlit bathroom and locked the door, not knowing that drugs and other items were in the bathroom (Ex. G at 256–61).  With regard to the chemicals and items in the kitchen, defense

counsel argued that the only reason Petitioner knew of their presence was because he was present when the officers searched the trailer (*id.*).  In support of this theory, defense counsel questioned Investigator Hardage as follows:

> Q.     Did you talk to the defendant at all subsequent to his arrest?
>
> A.     Yes, sir, I did.
>
> Q.     Did he disavow any knowledge of the contraband that was found in the house?
>
> A.     He states that the stuff in the home was not his and he did not bring it there.

(Ex. G at 103–04).

On re-direct, and over defense counsels' objection, the prosecutor further questioned Hardage about his interview with Petitioner:

> Q.     What did the defendant tell you when you interviewed him?
>
> A.     The following day we spoke to Mr. Bowden and he states that he was on probation in Georgia for drugs.
> . . . .
> Q.     Okay.  He said he was on probation in Georgia for drugs?
>
> A.     He stated he need [sic] our help because he was on probation—

(Ex. G at 104–05).  Defense counsel objected and argued at sidebar that the court had previously specifically ruled that the witnesses were not to indicate that the nature of Petitioner's probation was drug-related, and that the reference was "extremely prejudicial" (*id.* at 105).  The prosecutor argued that defense counsel "opened the door" when he asked Hardage about Petitioner's statement (*id.*).  The court overruled defense counsel's objection (*id.*).  The prosecutor continued:

> Q.     What else did he tell you about the drugs that were found there at the Redmon home that day?
>
> A.     He stated the drugs were not his; that he hadn't brought any of the drugs there.  I asked him if he had used drugs.  He stated that he had not; that he had seen Kenny Redmon using drugs.  He made a comment about the drugs that we had found in the kitchen.

(Ex. G at 106).

At the post-conviction evidentiary hearing, defense counsel testified that he believed it was important to the defense for the jury to hear that Petitioner disavowed any knowledge of the contraband in the Redmon's house (Ex. V at 6–25).  Defense counsel testified he did not believe that his question to Hardage "opened the door" to testimony regarding the nature of Petitioner's probation.  Defense counsel admitted that when he asked the question of Hardage, he was aware that it could potentially allow the State, under the "rule of completeness," to ask additional questions about the context of Petitioner's statement to Hardage, but counsel testified that because of the trial court's previous order prohibiting the State from offering evidence of the drug-related nature of Petitioner's probation, he believed that the State was precluded from adducing such testimony from Hardage.  Defense counsel admitted he did not request a cautionary jury instruction or move for mistrial.

The state court reasonably applied <u>Strickland</u> in determining that Petitioner failed to demonstrate prejudice from counsel's alleged deficient performance.  The testimony that Petitioner admitted he was on probation for a drug-related offense was only one of many pieces of evidence suggesting Petitioner knew that the drugs, precursor chemicals, and paraphernalia were in the Redmons's home.  The jury heard Petitioner's admission to Deputy Garrett that he had previously traded items for methamphetamine, thus establishing Petitioner's familiarity with and prior use of the drug.  The jury also heard the Redmons testify that Petitioner brought some of the chemicals and paraphernalia from Marvin's house; Petitioner and Kenneth Redmon bought many of the other meth-production items prior to arriving at the Redmons's trailer; there had not been any meth or related chemicals or paraphernalia in the Redmons's trailer prior to Petitioner's arrival; Petitioner had previously used meth in the Redmons's presence; Petitioner and Kenneth Redmon manufactured meth while Kimberly was out of the trailer; Kimberly was familiar with the physical appearance of a person who had used meth, and Petitioner and Kenneth exhibited that appearance when she returned to the trailer; Kenneth Redmon admitted he used meth while Petitioner was in the trailer; and Petitioner was in the locked bathroom with items containing meth residue (the hot plate, metal spoon, and Pyrex dish), as well as a other paraphernalia (the syringe and hypodermic needle), in plain view on the counter and toilet seat.  During closing arguments the nature of Petitioner's probation was never mentioned by either party.

Petitioner has not shown that no fairminded jurist could have concluded, as the three judges of the Florida First DCA did, that he failed to carry his burden of showing that if the jury had not heard the drug-related nature of his Georgia probation there is a reasonable probability of a different verdict.  Petitioner has not shown that the evidence on the prejudice question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, "beyond any possibility for fairminded disagreement."  Harrington, 131 S. Ct. at 787.  He has not shown that the Florida First DCA's determination of the prejudice issue was so unjustified that it "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87; *accord* Bobby v. Dixon, — U.S. —, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (per curiam); *see also* Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1258 (11th Cir. 2012).  Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

> D.    Ground Six:  "I am being held in violation of the United States Constitution, Amendment VI, Section 1, 'the accused shall enjoy the right to a speedy and public trial . . .' and 'to have the assistance of counsel for his defense.'"

Petitioner contends defense counsel rendered ineffective assistance by incorrectly advising him that the maximum penalty for the trafficking offense was twenty years instead of thirty (doc. 20 at 13).  Petitioner alleges if counsel had correctly informed him that the maximum penalty was thirty years, he would not have withdrawn his 12-year plea deal with the State and proceeded to trial (*id.*).  Petitioner alleges he presented this issue to the state courts as Issue Two in his Rule 3.850 motion (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 35 at 45).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 45–47).

> 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

Petitioner raised this claim as Issue Two in his Rule 3.850 motion (Ex. V at 6–10).  The state circuit court adjudicated the claim as follows:

> The defendant further alleges that the conflict-free defense counsel did not inform the defendant of the risk of exposure to potentially thirty years incarceration if he went to trial.  The defendant, however, received an offer of plea and signed a

> written plea agreement that listed the maximum penalty of trafficking
> methamphetamine as thirty years incarceration (See Attachment "B" to State's
> Response).  The written plea alone may refute a post conviction claim.  *See Russ v.
> State*, 937 So. 2d 1199 (Fla. 1st DCA 2006); *Golden v. State*, 703 So. 2d 1207 (Fla.
> 1st DCA 1997).  Further, the defendant proceeded with filing the motion to withdraw
> his plea pro se and before the conflict-free counsel was appointed.  The defendant's
> decision to withdraw his plea was made before counsel was even appointed.
> Therefore, the newly appointed conflict-free counsel cannot be deemed ineffective
> and the defendant's conviction and sentence shall remain intact.

(Ex. V at 94).  The First DCA affirmed the circuit court's decision without written opinion (*id.* at

114–15).

The record supports the state court's finding that the written plea agreement, which Petitioner

signed on August 19, 2004, expressly notified Petitioner that the maximum penalty for the

trafficking charge was thirty years (Ex. B).  By signing the written plea offer, Petitioner certified that

he was advised of the range of allowable punishments for the offenses, and that he was able to read

and had read everything in the plea agreement, or that everything in the plea agreement had been

read to him (*id.*).  In light of the fact that Petitioner was expressly notified that the maximum penalty

was thirty years, he failed to show that defense counsel was ineffective for misadvising him as to

the maximum penalty.

Petitioner has not demonstrated that the state court's adjudication of this claim was based

upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable

application of <u>Strickland</u>.  Therefore, he is not entitled to relief on Ground Six.

## IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court

must issue or deny a certificate of appealability when it enters a final order adverse to the applicant,"

and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court

issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28

U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L.

Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the

undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the amended petition for writ of habeas corpus (doc. 20) be **DENIED**.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 27th day of August 2014.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**